The next case called for a argument is N. Ray v. Interest of D.L.H. The next case called for a argument is D.L.H. I was sitting here listening to the last argument and thought, wait a minute, somebody's arguing my case. Bring it back by memories of juvenile court in the 70s. Yes, sir. But the last case and our case have very, very, very little in common. There's two issues I'd like to take up to begin with. One, on accountability. In the brief, the appellees say, the state says it's, quote, a certain court's finding of not not guilty may also be sustained on accountability theory. That's not going to happen in Illinois based upon People v. Millsap. Supreme Court of Illinois in 2000 said you've got to have notice, you've got to have a charge with, you've got to show a principle. Well, the state didn't have any of those whatsoever in this case. So the idea that if they didn't make it on the first degree murder charge, they'd go through accountability, doesn't stand based upon the Supreme Court. Second issue is waiver. This is very interesting. They're saying I, as trial counsel, waive my rights to getting the autopsy report. Yes, it's correct. Only I, as trial counsel, can ask for continuance of the discharge hearing. But either side can ask for the court to start tolling. And in this situation, the state asked for the discharge hearing. We didn't ask for it. The state knew we didn't ask for the discharge hearing. It had 120 days before the court had to have the hearing. Now, what I find interesting there is the state argues in its brief before this court that I forced the state to proceed with a premature record, and it was advantageous to me. Well, to start with, I didn't force. I didn't force the state. I didn't put a gun to the state's head and say, go ask for a discharge hearing. They can ask for a discharge hearing whenever they want to. I can ask for one whenever I want to. They're the ones who asked for it here. So if the court gives a premature record here, they knew the fact they didn't have to. The court looks at all the transcripts from all the hearings. In this case, it's had a multitude of hearings. In many of them, I insist. There's two things I insist on here. One is the court would not appoint a GAO for three or four hearings, and I finally brought the Supreme Court case in last July to them to show them they had to appoint a GAO. The second issue is I kept asking, I want to see a death certificate, and I want to see an autopsy report. I've got a right to present it to my expert and have my expert look at the autopsy report. They also say in their brief that the record shows that I engaged in deliberate and calculated strategy to force the state to put on its evidence at a discharge hearing before the autopsy became available. Again, I didn't force the state to do that. The state's the one that asked for the discharge hearing. They started at 128 o'clock. They knew they didn't have the autopsy because it wasn't the first time it was brought up. They go on and say Dr. Forsythe, who was the individual who did the autopsy herself, stated that she completed the autopsy the day after the death, which was in August of 2012. That was nine months back before the discharge hearing. The state knew very well if it was done or not done. The state rhetorically asked in its brief, why didn't I go interview Dr. Forsythe? I didn't interview her for two reasons. One is the experts want to see what the report says, and in case law in Illinois, if I want to interview her, I'm waiving my rights to the report, and I'm not going to waive my rights to the report. The next thing is, in testimony, I asked her where the report is, and she says it's sitting on the desk and is waiting for a signature. This is eight, seven, eight, nine months later. It's still sitting there. I argued Dr. Forsythe's not qualified to testify in this case, and I brought the idea of her on her qualifications. She said she was a student of forensic pathology. She was in a fellowship program. When I asked her how many autopsies she had done on this in the last 15 months or younger, she said it was her first one, maybe the best would be her second. She had done zero or one before. The state says on page 211 of the record, the transcript for the discharge hearing, that I said it was okay not to have an autopsy report. You have to read the whole thing in context. If you read the whole thing in context, the whole page, I was rhetorical saying that's okay. I'd never okay. Why would I spend time and time again before the judge in hearings saying I need the autopsy report? It goes to prove, in my opinion, since she completed the autopsy on August 12th, that she couldn't sign off on it because she wasn't qualified to do it, but she's there testifying in court as, quote, a forensic expert. You're saying that there's some evidence that she couldn't sign off on it because she was not qualified to? She was asked about signing off on it. She said she had to have somebody else sign off on it. Okay. And I'm saying that's an indication right there. But she's, quote, an expert, a forensic pathologist, which she's not, and she can go ahead and sign off on it and give it to me seven, eight, nine months ago when I'm asked. And I think that's very important in this case for that. The point about the waiver is I have never waived. If you look at all the case law, we cite our case law in our brief, there are a lot of ways you can waive. We didn't do any one of those whatsoever. And we feel that we have a right to have someone look at the autopsy report because even Dr. Forsythe herself, in her testimony, she couldn't, when asked a question with a reasonable degree of medical certainty, when, who, how it happened, she couldn't do it. The best she could say, it happened within a week. The next thing is she's saying it's blunt force trauma. When you look at the pictures, and the pictures are very gruesome, and I understand that, but when you look at the pictures and look at her evaluation, her description of what she testified to as to what she saw, externally there's hardly anything whatsoever on this child's face that is the child died. Yet the descriptive detail of what she saw in the autopsy, there's over 20 spots in the back of the brain. The state says my client confessed that he hit the child once in the forehead, once above the eye, and once on the side. At best, you take everything that's there. That's not 20 spots in the back of the brain. That's not even on the back of the brain to start with. We're saying that if we had an autopsy report to show it to our expert, even Dr. Forsythe, who testified, talked about SPS, shaken baby syndrome. That's another cause. This court back in 2000 said at the discharge hearing, the people were required to prove beyond a reasonable doubt that the defendant's actions were a contributory cause to the death, such that the death did not result from a source unconnected with the defendant's acts. And that's in People v. Durr, D-E-R-R, 5th District, 2000. We're saying the state didn't meet that burden. And, in fact, Dr. Forsythe's testimony indicates that. Now, Dr. Cuneo, last case I was hearing is the issue. We didn't ask Dr. Cuneo to make any evaluations here whatsoever. Between the court and the state, they had him evaluated for fitness for trial. It came up unfit. Now, we also filed a motion to suppress the statements before, on two occasions, the police officer. And Dr. Cuneo's report is part of the record. He finds that my client does not know how many days in a week, et cetera. He says my client, who is 9 years old at the alleged time of this incident, is at about a 7.6 educational level. He's borderline functioning. I mean, I could go into detail and take the picture. I'm sure the court's read that or will read it when we do that. I think the whole key here, it goes down to things that are very simple sometimes. Did he understand? My client understands there are random ones is what it comes down to, or motion to suppress them. And it is really unique. And, like, in the last case I asked the court, there's two. There's a 40-minute and a 33-minute, I think, two videos of this. But the state says he wasn't in custody. The state says he wasn't in custody. That's interesting. When you look at the tapes, the police officer tells the father, or tells my client that his father's sitting over there and he ain't going to leave. Now, if your father is there, the police officer's got your father there for support for you and you've got an adult there, but he tells you he ain't going to leave, why is that? Because it's just like this. When he goes through the random warnings, the police officer says, you have a right to be silent. Then the police officer comes back and he says, don't, don't be all quiet on me. Now, we're talking about someone who's got a 7.6 borderline functioning ability. He's told you to be silent. At the same time, he's told, don't, don't, and I'm quoting him here from the record, don't, don't be all quiet on me. What? As an adult who has two water degrees, I'd be confused what he's talking about, much less somebody that's like that. Don't, don't be all quiet on me. I thought you just said he could be quiet. He could be silent. Double negative. Ma'am? That's a double negative. Right. But that's what he's saying. I'm sure my client will never invite a cop to his table with a double negative. The point about the custody, when he says, and I'm quoting again, the police officer tells to my client, he ain't referring to his father. He ain't leaving. He's right there, okay? He's in custody. And the test you have to look at, what a recent person of my client's age would have believed. And the focus on the custody inquiry is always on what the juvenile thought or what he believed. Well, my client had already been said by Dr. Cuneo, he can't assist him in his defense. In trying to talk to him, he can't do it. He doesn't know what's going on. Dr. Cuneo, unlike the last case, really goes through my client on everything he can't do. He says he cannot assist, he cannot understand the nature and purpose of proceedings, his ability to assist his own counsel he can't do. He cannot grasp adversarial roles of the court, even after I broke them down into simpler terms. He kept insisting his daddy would help him in court. He could not understand the role of defense attorney. He could not comprehend that there would be a state attorney who would attempt to convict him due to his age and limited intelligence ability. He could not meaningfully cooperate with an attorney, much less assist his attorney in his defense. I mean, these are very strong words from not somebody I hired, not somebody my client hired, between the court and the state. That's Jim J. Bagley. So when you look at that, our argument is he is in custody, he didn't break any rights, he doesn't. Even if you believe that he can understand the rights, when the police officer is saying you have every right to be shot up, but don't be quiet on me, even if you believe he's not in custody because he's not handcuffed and taken out of the police station, don't forget a 9-year-old has rules for those, too. When he says that his father is sitting there and he ain't leaving, he's right there, okay? Mr. Walker, one point. Am I correct in remembering that the officer asked the father to move away? Yes, ma'am. That was in the second one. In the second one. And right after he went through the Miranda warnings in the second one, for the second time, and the second is interesting when you look at the tape. He didn't go through the warnings over them. He just said, remember basically what we were about last time. You know, it goes down again to the thing that on the first reading, he asked my client to initial, I'm sure you all have seen the Miranda warnings, they got a little thing up in each sentence, and you initial it. My client was asked by the police officer to initial. Now, you would think that's pretty simple, pretty basic, but if you look at the tape and see what my client did, my client wrote down the word David. Now, his father sat at the table that time and sees that and tries to correct him on the tape because my client doesn't understand one basic, he doesn't know what initials mean. Yet he understands the Miranda warnings, but doesn't understand what initial means. That shows the intellectual ability of my client, his worldliness, just like Dr. Cuneo had said. Like I said, I'm not sponsoring Dr. Cuneo, I didn't ask for him. They got him, and I lived with what he had to say. But my client understands Miranda warnings, but when he's asked to initial them, he starts to write his name, completely on the thing. It's incomprehensible to me to understand how you understand Miranda warnings when you don't understand what initials mean when you've been asked to do the initials. That, to me, is a big focus. When you look at my client's age, his intellectual ability, his mental makeup, but giving Miranda warnings to him, the experience with the criminal justice system, which he had none. The state says, well, he fought the DCFS. That's not the criminal justice system. He had never had any exposure to the criminal justice system. And when you look at the length of the interviews, the state says 40 minutes and 33 minutes are the two interviews, and they're short. Well, ABC, NBC, CBS, all these stations, networks spend billions of dollars to find out that our comprehension level as adults is about 12 to 15 minutes, and they have to break for commercials so they keep our interest. And that's adults. I'm not going to argue with those networks and their billions of dollars to think that 40 minutes to a 9-year-old who's got a 7.6 intellectual level and who, at the same time, doesn't understand what initials mean, can't help his defense attorney in any way according to the doctor, he's unfit to stand trial, that 40 minutes isn't a long time. You can't look at it again in your perspective. You've got to look at it in his age and his level of what it is for him. And 40 minutes sitting there and 33 minutes respectively sitting there. The most important thing I think here is the totality, is did the state prove beyond a reasonable doubt that my client is not not guilty of first-degree murder? And we're saying they had an expert that was competent, wasn't qualified. If you look at what the expert said, nobody has ever said that this is what killed, this is not what gave it was. And the thing is important here because there's testimony of the child being knocked on the table. There's testimony of the child being slapped by his mother. Then they come back and say, well, there was a physical affair that was there early afternoon and this happened at night. Well, if you look at that, you say, OK, there's four or five hours in between there, so nothing happened during that time. The state didn't prove any of that whatsoever. Next thing when you sit there and you think about this, allegedly my client beat the victim. The parents were called by this 11-year-old and parents don't come for over an hour and a half. They're close by. They're not worried where they're at. Then when they do get home after they've had this fall, they go to bed. And it's 2 a.m. in the morning before anybody goes in to check on, quote, the victim. Common sense tells me that if somebody has been beaten to the point of almost dead by my client, there's going to be facial scars, there's going to be cuts, there's going to be bruising, there's going to be bleeding. This would be very bad. Dr. Forsythe who did the autopsy didn't see all that because it didn't exist. Then the next thing is, all the damage would have killed him because he was in the back of the head. How did that come about? Was it an impact? Impact from shaking? The state did not prove, beyond a reasonable doubt, didn't even come close to it, that my client is guilty of first-degree murder. Thank you, Your Honor. Thank you, Counsel. Counsel? May it please the Court? Counsel? First, with regard to the question of custody, this respondent was not in custody. With regard to the adult attention span that the opposing counsel proposes, there's no evidence in the record regarding adult attention span. The people in the answer brief cite a case stating that 35 minutes is consistent with a non-custodial interview, and in this case the interviews were 40 and 33 minutes, respectively. The other factors also indicate non-custodial 6.30 in the evening, constant presence of the minor's father, one officer wearing plain clothes. The officer testified that at times he put his head down on the top of his hands on the kitchen table so that he was not looming over the respondent. The respondent argues that when the officer said, don't be quiet on me, that was somehow inconsistent with the Miranda warning. First, in context, and this was discussed in the people's answer brief, the officer was encouraging the minor to speak up if he did not understand his Miranda rights, and it would be ironic indeed if that statement, which was intended to preserve the non-custodial and voluntary nature of the evidence, that it was the opposite. Also, the minor did, before the officer made this statement, rephrase his right to remain silent. The officer explained that right using age-appropriate language in the minor and then asked the minor to rephrase that, and he said, it means I don't got to say nothing. He understood that, and the officer's later invitation to ask further questions about his Miranda rights did not render the respondent in custody or render his Miranda waiver involuntary, if indeed we even reached the Miranda issue, because as Justice Chapman pointed out, the minor was not in custody. When the officer said that the father would not leave the room, he said that in the context of reassuring the respondent that the father would remain in the kitchen during the second interview. A reasonable person of the respondent's age could not have understood that this meant that the father was prohibited from leaving the room. It was simply to reassure the respondent that his father was going to remain there, and again, it would be ironic if this statement, which was meant to be reassuring, ended up being used as evidence that the respondent was in custody. Did the officers have their guns on them? It was one single officer, Your Honor. He was in plain clothes, but he did have a holstered weapon. However, a case law cited by the state in the People's Brief indicates that for the presence of a weapon to be in favor of custody, it has to be a weapon that's drawn, used, referred to, or something. It's not enough that it remain holstered. The respondent argues that the custody determination must be made in the context of what this particular minor would have believed, given that he was unfit, given that he had a borderline intellectual ability. However, the U.S. Supreme Court in JDB, a case cited in the People's Answer Brief, stated that the reasonable person standard should be modified only where the officer either knew or should have known of this personal characteristic of the interviewee. In this case, Officer Adams did not know of any intellectual disability as he testified, and further, he could not have known of it, given that the respondent's performance on the videotape, which appears by any measure to be that of a normal nine-year-old child, and given that Adams asked the father before the interview began if the respondent had any physical or mental conditions that he needed to know about, and the father said that the respondent just had asthma, did not volunteer any borderline intellectual functioning. For these reasons, the custody determination should be based on what a reasonable person of the respondent's age would have believed without regard to his subjective belief or his characteristic of limited intellectual ability. Oh, and then with regards to the question of whether the respondent consulted with an adult, the respondent doesn't cite any cases that stand for the proposition that the respondent is kept, that a defendant or minor is kept away from his parent where that parent remains in the room. The parent sat at the kitchen table during the entirety of the first interview and only during the Miranda portion of the second interview, but remained in the room and also accompanied the respondent and the officer through the rest of the house when the minor did the physical demonstration of what had happened that night. This is not the sort of separation from a parent that has been used as evidence of an involuntary statement or a custodial statement. So the minor was not in custody, but even if he did, he knowingly waived his Miranda rights, and the court's factual finding was not against the manifest weight of the evidence. I would like to call the court's attention to a brief. At one point, I referred to the appropriate standard as abuse of discretion. That was a mistake. The case that I cite for that says it's manifest weight of the evidence, and it is, as the respondent said here today. So this factual finding was not against the weight of the evidence. It's important to note that this case is not like the cases cited by the respondents here of Bernasco and M.W., and from what I understand of the case that this court just heard, it's not like that case either, in that in this case, there was no testimony that the respondent did not or could not understand the words in the Miranda warnings. In this case, there was no such testimony, and no such factual findings. The fitness inquiry is not the Miranda inquiry under People v. Stevens, which the court cited in the I'm sorry, which the people cited in their answer brief. And also with regards to the question of signing versus initialing the Miranda waiver form, Officer Adams testified that he didn't think that this meant that the respondent didn't get it, didn't understand. There's no evidence that he didn't understand what the initials were. He just signed it instead of initialing it. And in any event, that evidence can't overcome the abundant evidence that the minor did understand his Miranda rights. He rephrased the ones that he was asked to, he spoke up when he said he didn't understand one, and then affirmed that he did understand it. He used appropriate communication skills. Officer Adams was a juvenile officer and used age-appropriate language in explaining those rights. And observed no substantial observable intellectual limitations. With regards to Issue 2, just one point about Dr. Forsythe's qualifications as an expert in forensic pathology. Although she did testify upon being asked by Respondent's Council that she had done either 0 or 1 forensic autopsies on children between the dates of July 1st and August 27th, 2012. She also testified that before that date, she had done more than 200 autopsies. And she testified that at the time of her expert testimony, she had done more than 400 autopsies, including 10%, 40 on children. She was qualified as an expert in forensic pathology and the court did not abuse its discretion in accepting her as such. It wasn't required that she be a BOAR certified forensic pathologist. Certifications are irrelevant if there is other expertise gained through experience or education or training. With regard to Issue 3, a reasonable fact finder can find the Respondent guilty of first degree murder. I'll note that Dr. Forsythe testified that these subthaleal hemorrhages, the hemorrhages to the scalp, were all less than a week old. She tested them all. She tested 11 different sections of bruising. I think there were 20 or about 20 total sections. She ran tests on over half of them. And they all showed up as being the same age. These were not sustained over a period of time. Furthermore, these subthaleal hemorrhages were the same age as the subdural hemorrhages, the blood between the brain and the skull. She testified. And she said that these injuries could not have been sustained weeks earlier or even a week earlier. These were injuries that were less than a week old. She testified that all of the injuries that she found, the diffuse axonal injury, the subthaleal hemorrhages, the subdural hemorrhages, the retinal and optic nerve hemorrhages, were all consistent with having been inflicted on August 22, 2012 during the time that the victim was alone with the Respondent and there were two other toddlers in the room, but they were two and three years old and one of them had developmental delays of his own. And furthermore, the victim here became symptomatic within minutes or perhaps even seconds of the 11-year-old hearing the boom boom noises. He testified that he was in the other room, the other children, Respondent, the victim, and two other toddlers were in the playroom when he heard noises he described as loud boom boom, as though someone was stomping with their feet on the floor. He testified they were slamming something against the wall. He went into the room twice out of concern of these noises and the second time that he did so, he saw the victim lying face down on the floor which was an unusual posture for him, making noises that indicated that he was in distress. The victim went limp and these symptoms, making noises, going limp, are symptoms of diffuse axonal injury, Dr. Forsythe testified. So he was symptomatic within minutes and Dr. Forsythe testified that a person with diffuse axonal injury does or can become symptomatic within minutes, but hours at the absolute outside of that time and by two o'clock in the morning when one of the adults came home and checked on the baby because she noticed him making these noises which were themselves consistent with the diffuse axonal injury, it observed him with his hands bald, his fists bald like this which is also a symptom of a diffuse axonal injury. So these injuries cannot have been caused, as our respondent speculates, by this glass table incident which occurred, according to Officer Adams, one or two months prior to the fatality here. These injuries, the diffuse axonal injuries, the subdural hemorrhages, would have had immediate and devastating symptoms. The subgaleal hemorrhages and subdural hemorrhages were fresh, sustained within a week, they could not have been sustained one to two months prior. And the fact finder in the circuit court could reasonably infer that the respondent caused those injuries. Taekwon's injuries were consistent with these loud repeated thumping sounds that Taekwon heard when the respondent was with the victim. And then Taekwon found Taekwon exhibiting symptoms of those injuries. And with regards to the respondent's speculation that the death was caused by shaken baby syndrome, this is not what Dr. Forsyth testified to. She testified that some of these injuries were consistent with shaken baby syndrome, but that all of the injuries were consistent with a strong impact or series of strong impacts. And in any event, this speculation is irrelevant because the state was not required to prove the particular means by which the killing was accomplished. With regards to the respondent's observation that there were no external injuries, the cause of death was closed head trauma. Also, the subgaleal hemorrhages, the bruising to the scalp, was not visible from the outside because of the hair and because of the thickness of the skin and muscle there. But when the scalp was reflected back, pardon me, peeled back, these hemorrhages were visible. And it's notable that the respondent knew of the existence of these subgaleal bruises on the victim before those bruises even showed up on August 24th at his first interview with Adams. He, apropos of nothing, volunteered an innocent explanation for how the victim could have sustained bruises to the back of his head. He motioned to the back of his head. The big spruce on the victim was to the back of his head. He told Adams unprompted, they say every, this is a quote, they say every time he'd get a tantrum or something, he'd hit his head on the bottom, the bottom of his head, motioning to the back of his head. And that's what must have happened, he said. And the fact finder could reasonably infer from this statement that the respondent caused the injuries. With regards to the respondent's argument that the injuries to which the respondent admitted were not fatal injuries, that he admitted only to or demonstrated to Adams striking the child once at his side, there's no reason for this Court to limit the inquiry in this matter. The question is what a fact finder could reasonably find or infer from the evidence before it. And then finally with regards to the autopsy issue at Issue 4, of course this Court's already denied the respondent's motion to supplement the record with the autopsy report. I believe that the record will the statutes will reflect that the State was required to ask for that discharge hearing within a specified period of time. Of course, as the Court knows, the defendant didn't file a reply brief, so I'm caught a little unawares by that argument. But I do believe the State was statutorily required to ask for a discharge hearing within the time period that it did. And of course the State believed that it would have an autopsy report before that discharge hearing. It's worth noting that Dr. Forsythe testified that there was a regular stain or test series of stains and tests done on the victim's brain tissue and because the victim was an infant, the brain tissue was required to be preserved in formaldehyde solution for a period of months before the before those tests could be conducted. I think it's safe to assume that that's part of the reason for the delay here because the autopsy was not a single day procedure. It did take months to complete that portion of it. Also, the autopsy report was required to be signed by the Chief Medical Examiner who signs all of the reports, not just this particular one. Also, the record does reflect that the State repeatedly offered to continue that and the respondent agreed that it was within his power and his power alone to continue the discharge hearing. Also, as a final note, the Court did appoint a guardian ad litem when the respondent asked that guardian be appointed. The rest of the facts and circumstances regarding this inability to turn it over because the State did not have it are laid out in the people's objection to the motion to supplement the record with it, which was incorporated into the people's answer brief. I'd be happy to answer any questions that the Court has. I don't believe we have any. Thank you, Counselor. Counselor? To begin with, the Court did not point to G.L. when I asked. I asked three different times for the record to show three different proceedings to have a G.L., per the Supreme Court ruling, and the Court wouldn't do it. It finally did it when I stopped going orally with the record, filed an official motion, and attached the case to the judge to read. That's what the Supreme Court said you had to do. He ain't leaving. I'm telling you, when you look at the two gifts, that's what he says. He ain't leaving in reference to my client's father. There's no way to interpret, don't, don't be all quiet with me after he's discussed. You have a right to be silent. Next thing, it's interesting, they want you to, this 11-year-old that saw this stuff and did this stuff, you know, if you look at the second disc, my client goes through and demonstrates through the house. You see how the house is spread out. You see three TVs. There's at least a TV going on in the room, the playroom. There's a TV going on because the 11-year-old says he's listening to one. So over two or three TVs, it observes the house, he hears all this stuff going on. I find that hard. The next thing is, like I said before, this court, in People v. Deer, D-E-R-R, said at the discharge hearing, the people were required to prove beyond a reasonable doubt the defendant's actions were a contributing cause to the death such as the death did not result from a source unconnected with the defendant's acts. Now, what's interesting, if you look at the transcript, page 264, 265, which we cite in our brief on page 46, Dr. Forsythe, this is the person that I don't believe is qualified, not an expert, is a student of forensic pathology. But isn't she board certified as a pathologist? She's a board certified anatomic pathologist, which is totally, she's no Quincy, I'm not asking for a Quincy, but I'm asking for somebody that knows what they're doing. She says this, and let's take their position, she's an expert, she's the one you should listen to. But when you look at this, and I said it's on the transcript, pages 264, 265, page 46 of our brief, Dr. Forsythe testified that the diffuse noxional injury, the injury we're talking about in the back here, she found in the victim is associated with shaking an infant's head and does not result from general childhood trauma. This is their expert saying that. Yet they get up here and say, ah, shaking baby, it ain't that. This is the only testimony as to that fact. And so it's our position that our client is not not, finding the not not guilty to our client was inappropriate, the suppression motion should have been granted, and that we feel this court should reverse the lower court and find our client not guilty, or on the alternative, send it back with the direction that I am given the autopsy report, and given the appropriate time to have an expert look at it so that my expert, he can come and testify as to the cause of death. Because what I've cited to you from the Durr case in this circuit says that they have to prove beyond a reasonable doubt that my client had nothing to do with the actual death of the child from the injuries that he suffered. And I believe, from listening to Dr. Forsythe, what her basis is, from doing zero or one, being a student of forensic pathology at St. Louis U, that we're entitled to that. And that's what we're asking for. Thank you, sir. Thank you, counsel. We appreciate the brief and arguments of counsel to take the case under advisement. The court will be in a short recess, and have argument on projects.